(No. 18845.—

SADIE C. SCHIAVONE *et al.* Appellees, *vs.* CATHERINE ASH-
TON *et al.* Appellants.

*Opinion filed October 25, 1928—Rehearing denied Dec. 11, 1928.*

LUTHER F. BINKLEY, and WILLIAM E. MOONEY, for
appellants.

FREDERICK A. BROWN, (WILLIAM G. WORTHEY, and
J. COLBURN HAMILTON, of counsel,) for appellees.

Mr. JUSTICE DUNN delivered the opinion of the court:

The circuit court of Cook county entered a decree on a
bill filed by the appellee Sadie C. Schiavone, setting aside
a contract for the sale by her to the appellant Catherine
M. Ashton of certain real estate in Chicago and dismissing

the cross-bill of Catherine M. Ashton for the specific performance of the same contract. Catherine M. Ashton, J. C. Mecartney and Newell Mecartney have appealed from the decree.

The cause alleged in the bill for setting aside the contract was fraud, the bill alleging that the complainant's husband, Michael F. Schiavone, was approached by a man claiming to represent J. C. Mecartney & Co., real estate brokers, who stated that he represented a widow seventy years of age living across the street from the lot in question who desired to purchase the same in order to move a frame building on it; that she was of very limited means and unable to pay more than $2000 therefor; that the complainant, believing said representations, and being unable to investigate them because she and her husband were on the verge of leaving for Florida, entered into the contract in question to sell the lot to Mrs. Ashton for $2000, to be paid in installments, and received on the purchase price $200 and three monthly payments of $50 each; that all such representations were false; that Mrs. Ashton was a mere dummy; that she did not live across the street and was not seventy years old; that she was not poor and had no interest in the contract; that J. C. Mecartney was the real purchaser, or the representative of a syndicate who desired to buy the property because of its great value; that the complainant learned of the falsity of the statements about January 9, 1925, and that Newell Mecartney admitted such representations to be false and offered to pay an additional $2500 for the deed, and an escrow agreement was entered into whereby the deed was deposited in escrow with the Chicago Title and Trust Company, which was authorized to deliver it to Newell Mecartney when there was deposited with the title and trust company $4180 to be paid to the order of the complainant, less the following allowances: an amount equal to the 1924 taxes, guaranty or abstract

charges, revenue stamps $4.50, one-half of escrow fee; that the escrow agreement was repudiated by the Mecartneys, who insisted that the complainant carry out the terms of the original agreement, and attempted to make a tender of the balance due under the contract of September 25; and that the complainant notified Mrs. Ashton and the Mecartneys that she would no longer be bound by either of said agreements, and tendered back the amount of money received, which she brought into court. The bill prayed a rescission of the contract of sale and the escrow agreement. The answers of the defendants admit the execution of the contract between Sadie C. Schiavone and Mrs. Ashton and the ownership of the property at the time by Mrs. Schiavone, but deny the remaining allegations of the bill. Mrs. Ashton's cross-bill alleges the execution of the contract of September 25, which she makes a part of the cross-bill, the payment of a part of the purchase money and tender of the remainder to the Schiavones, who have repudiated the contract without cause, and prays for a specific performance of the contract.

The evidence discloses the following facts, which are not in dispute: The property involved was a vacant 25-foot lot about a mile west of State street and a mile and a half south of Madison, on the north side of Fourteenth place, directly across the street north of the building erected by the produce merchants of Chicago for their business when they were compelled to move from South Water street by reason of the Wacker Drive improvement. It is situated on the West Side of Chicago. Schiavone bought it over ten years before the time he testified. He was then dealing in property on the West Side. He bought it to re-sell, as an investment, and sold it to a man named Secetta. He afterward traded another house to Secetta and got this property back. There was a very old house, in a dilapidated condition, on the property when Schiavone got it, not fit to live in, so he had it demolished perhaps six years

ago, selling it to the wrecker for $45 or $50. From the time the house was wrecked he had had no offers from anybody to purchase the property until Mecartney's. He held it and paid taxes on it all the time and did not try to sell it. The record title was in his wife, who did not participate in any way in the making of the contract further than to consent to it, to sign it, and to indorse the check for the cash payment. Schiavone was a real estate broker having an extensive business, operating in Chicago and in Florida, having many salesmen in his employ, and was a director in several banks. Mrs. Ashton was a widow, fifty-nine years old, whose husband died in 1899, leaving her with five children, whose ages ranged from two to thirteen years. The oldest boy disappeared about ten years ago and has never been heard from. The other children are still living in Chicago, the youngest boy being an invalid, who has never worked in his life. At the time of her husband's death she had about $100. She obtained employment as a janitress with the People's Gas Company, where she stayed for eleven years. She was then at home for a time with her daughter, who was sick, and then went to Florida. Her daughter would not stay there and she had to come back. She then went to the Young Men's Christian Association building, on LaSalle street, and was matron there for eleven years. In August, 1924, she purchased a candy store, which was opened on September 2, and she lost all she put in there. She had known J. C. Mecartney for twenty-two years. She testified that she was Scotch and liked to save and saved up her money until she got $500. She heard of a cottage on Swan street advertised for $1000 and went to Mecartney and asked him about it. Since that time Mecartney has continued to buy and sell property for her, buying, selling at a profit and re-investing. He acted as her adviser and agent in all her real estate transactions. She had not asked Mecartney's advice on the venture in the candy store. She invested $2000 in that—the worst thing,

she testified, she ever did, but she got experience and didn't lose so much. She sold the store for $500. The first time she talked with Mecartney about the lot on Fourteenth place was shortly before she went into the candy store, on September 2, 1924. He told her he was going to buy in that neighborhood, and she told him to go ahead and use her money to buy property for her so that she would get interest. At the time the contract was signed Mrs. Ashton had from $3000 to $7000 in Mecartney's hands which he had invested for her; a farm in Florida, which she had bought when she went there, not through Mecartney, and for which she had paid $4000; and the candy store, for which she had paid $2000 and which she later sold for $500. Mecartney had been in the real estate business for over twenty years. After his talk with Mrs. Ashton he caused inquiry to be made, tried to locate owners of vacant lots in the vicinity in question, and on September 20, 1924, mailed letters to several owners inquiring if their property was for sale. One of these was addressed to S. Schiaron, at Schiavone's home address. Michael F. Schiavone received it. He called Mecartney on the telephone, and the negotiations between them resulted in the contract dated September 25, 1924, by which the appellees agreed to sell and Mrs. Ashton to buy the lot in question at the price of $2000, payable $200 at the signing of the contract and $50 a month thereafter. As a part of the transaction Mecartney guaranteed the performance of the contract on the part of Mrs. Ashton, and further guaranteed that in the event she elected to build or have a house moved on the property he would keep the property free and clear of any liens or judgments. Besides the $200 cash payment, three monthly payments of $50 each were made on October 25, November 25 and December 15, 1924, in each case by the check of Mecartney for $50. On December 31, 1924, Mecartney wrote a letter to Schiavone, who was in Sarasota, Florida, stating that Mrs. Ashton had made a loan and desired to pay her con-

tract up in full, inclosing a warranty deed for execution and suggesting that it be executed and mailed to Schiavone's office so that the purchase money could be paid and the deed delivered as soon as the papers were ready. The letter stated that Mecartney had called at Schiavone's office to get the abstract to have it brought down to date, but the persons there were unable to say whether Schiavone had a guaranty policy or an abstract, and expressed the hope that Schiavone could deliver the abstract and the guaranty policy at once, so that it could be brought down to date. Schiavone received this letter just after the first of the year and neglected it for four or five days, when some brokers came down from Chicago and told him about the big boom in the market,—about the big development on Fourteenth place and Racine avenue,—and when he found that the market was booming there he began to think that this Mecartney deal was a frame-up. In the early part of January he employed Greenwald, a lawyer of Chicago who had come down to Florida and had remained for some time. He told Greenwald about the purchase of the lot; that a widow who lived across the street was moving her house and Mecartney had put one over on him, and asked Greenwald to look into it when he got back to Chicago and report. Greenwald upon his return to Chicago conferred with Mecartney and his son, Newell, who is a lawyer. As a result of these negotiations the escrow agreement mentioned in the bill was executed and Greenwald deposited the Schiavone deed to Mrs. Ashton with the Chicago Title and Trust Company under that agreement. The escrow agreement was declared to be without prejudice to the contract between the parties to the deed for sale and purchase of the premises described in the deed, and it was stipulated that upon delivery of the deed and payment of the money both copies of the contract were to be canceled, and if a deposit was not made within thirty days from date the warranty deed was to be returned to Sadie C. Schiavone

or her attorney. On January 26, 1925, Schiavone, Greenwald and Bowman Cox, an employee of Schiavone, called on Mrs. Ashton in her candy store and tendered her the money she had paid on her contract of September 25, serving her with written notice of rescission of that contract, and served the same notice upon J. C. Mecartney and made a like tender to him. On the following day Greenwald and the complainant served a written notice on the Chicago Title and Trust Company requesting it not to deliver the warranty deed which had been deposited in escrow, and subsequently this suit was brought. On February 6, 1925, Newell Mecartney made a tender of the balance due under the contract of September 25 and the additional sum of $2500 under the escrow agreement, which was refused because of the pendency of this suit.

The only persons concerned in the negotiation of the contract of sale or its execution were Schiavone and Mildred F. Bessel, his secretary, on one side, and J. C. Mecartney, Catherine Ashton, Ann J. Voss and Harry F. Souder, the last two being employees of Mecartney, on the other. The evidence of fraud in the inception of the contract must be found in the evidence of these witnesses.

Schiavone testified that upon the receipt of Mecartney's letter of September 20 he had his secretary, Miss Bessel, call Mecartney by telephone and tell him to send a representative over and Schiavone would talk with him. Mecartney sent a representative over—a young man whose name Schiavone did not recall but whom he later identified as Souder. He wanted to know about the price of the property, and Schiavone told him that the property stood him in the neighborhood of $7500, figuring accrued interest, taxes and so on, and he wanted to get that much money for it, and Souder said that Mecartney had a prospect,—a poor old widow who lived directly across the street from the property and had a house there,—who could not afford to pay any such price for the property and who was very old

and poor, had very little money and could only afford to pay very little money in a deal; that if Schiavone wanted to do this old woman a good turn the best price Mecartney could get for him was $2000. Schiavone said he was very busy and wanted a chance to think it over and would let Mecartney know. The same man came back a few days later. Mecartney called Schiavone up and asked if he had decided to sell that lot. Schiavone told him that he did not have time to look into the matter—that he had been very busy because he was on the verge of going to Florida; that Mecartney said, "I advise you that you will be doing this woman a good turn this day;" that $2000 was all the property was worth; that she was a poor old widow and had not much money, and he advised Schiavone to sell the lot because he could not get any more money for it, and if he would sign a contract before he left, Mecartney would send over a check right away. Schiavone said the lot stood him $7500 and he felt he ought to get that much, but if this was a poor old widow and Mecartney advised him to sell the lot,—he was an awfully busy man and had so many interests and this was so small a deal,—that if Mecartney thought he was doing this woman a good turn, to send his representative over and Schiavone would sign a contract on one condition: that he be protected in reference to liens; that Mecartney had told him the woman lived across the street and was going to move her house and was poor; that she was ready to move that house and would likely have plumbers and carpenters work there and he might have a lien on the property and wanted to be protected against that. Mecartney told him that he would protect him; that he would guarantee personally that if any liens came up when the house was moved he would guarantee Schiavone against liability. He said he would send his representative over. He did send him over and Schiavone had another talk with his representative—the same man as before. He had a contract with him the second time, not signed by

anybody at that time. He left the contract with a check for $200. Schiavone took the contract and told Mecartney's representative to get together with Miss Bessel and draw up an agreement protecting Schiavone against liens. Miss Bessel was called and instructed to draw the guaranty contract and did so. Schiavone took the contract of sale home and it was signed there by his wife and himself. The guaranty agreement was signed by Mecartney.

Miss Bessel testified that she was called into Schiavone's office, where there was a representative from Mecartney's office, and received instructions to draw the guaranty agreement. Mecartney's representative told of the poor widow of limited means who was buying a lot and wanted to move a house on it. He said the widow might want to build, and Miss Bessel made the guaranty cover both conditions—the building and moving the building. This interview was two or three days after the first interview. Two copies of the contract of September 25 and the check for $200 were delivered to her by a messenger or mail. The contracts were signed by Mrs. Ashton and were afterward signed by Schiavone and his wife. Both the contract and the check were dated September 25, 1924, and the check indorsed by Mrs. Schiavone was paid through the clearing house on September 27.

Mecartney testified that he received a telephone call from Schiavone about 9:30 Thursday morning, September 25, during which Schiavone said he called in response to the letter of September 20. Mecartney then inquired what he wanted for the lot, and Schiavone said, with the interest on it, it cost him about $2500. Mecartney said he would give $2000—$200 down and $50 a month. Schiavone asked what Mecartney wanted it for. Mecartney said he wanted to move a house on it. Schiavone asked about the commission, and Mecartney said he would give that net, as he was buying for a widow client and he would make his commission from her, as he would have to superintend

the moving of the house and the remodeling to make it a paying proposition. Schiavone said to send over a contract—that the lot stood in his wife's name. He gave Mecartney a full description of the lot, and Mecartney said he would send over a contract. He then instructed the girl in his office to prepare the contract and draw a check for $200, payable to Mrs. Ashton. This was done, and he instructed the girl to take the contract and check over to Mrs. Ashton, have her sign the contract, indorse the check and deliver them to Schiavone's office. On the following Saturday morning he instructed Souder to call at Schiavone's office and get the contract, and while Souder was there Schiavone called up and said he wanted to be protected against liens, and Mecartney advised him to prepare any kind of an agreement that he desired and Mecartney would sign it. Shortly after, Souder came back with the guaranty agreement and Mecartney signed both copies, kept one and gave the other to Souder to deliver to Schiavone's office. Souder did deliver the guaranty agreement and brought back the contract. Mecartney denied sending a representative over to Schiavone's office to negotiate for the sale of the lot, denied any agreement over the telephone to do so, and denied making any statements as to the age, residence, physical or financial condition of Mrs. Ashton, and stated that these were all the conversations he ever had with Schiavone; that he never sent anyone over to talk with him or to see him except Souder, and did not tell him over the telephone he was sending somebody over to talk with him about the deal.

Ann J. Voss testified that on September 25, 1924, at Mecartney's request she prepared the two copies of the contract of that date and a check for $200; that she took them to Mrs. Ashton in the Young Men's Christian Association building, on LaSalle street, had her sign the contract and indorse the check and then took them to Schiavone's office and asked for him. The girl told her that

Schiavone was busy, and asked what she wanted. She then delivered the contracts and the check to the girl, who took them into the private office, and when she came out said that Schiavone wanted to take the check and contract home so that Mrs. Schiavone could sign them, and to call the next day.

Harry F. Souder testified that the first time he saw Schiavone was on September 27, 1924. He called at Schiavone's office in the forenoon to get the contracts and asked for Schiavone. Being told that he was out but would return in about an hour he went away, saying he would come back later, and he did. After waiting a few moments he was ushered into Schiavone's office. Schiavone took some papers from his desk and stated that he would like some guaranty agreement about the widow so there would be no liens against the lot in case she moved a house on it. Souder asked him to call Mecartney on the telephone. He did so and thereupon asked Schiavone's secretary to draw the guaranty contract, which she did. Souder then took two copies of the agreement to Mecartney's office, Mecartney signed them, and Souder took one of them back to Schiavone's office and got a copy of the contract of September 25, which he took back to Mecartney. He denied any other negotiations with Schiavone or making any representations of any kind to him.

Three monthly payments of $50 were made, as required by the contract, and accepted by the complainant, and no intimation of dissatisfaction with the contract was made until after the offer on behalf of Mrs. Ashton to pay the balance remaining due on the contract and her request for a deed. The evidence shows that Schiavone's desire to avoid the performance of the contract arose not from any fraud in the making of the contract but from the information which came to him afterward of the activity in real estate in the neighborhood occasioned by the removal of the produce merchants from South Water street, made nec-

essary by the construction of Wacker Drive. It had been known for a year before August, 1924, that the produce merchants would have to move but there was no public knowledge where the market would go. On August 11, 1924, eight persons entered into a contract with the Chicago Title and Trust Company for the purpose of acquiring real estate for the use of the produce merchants. While the agreement contemplated the purchase of real estate it did not contemplate the purchase of the lot in controversy in this case, and the agreement did not set forth or designate any particular location or any property or locality in which it was to become operative. It was not a public document and was never recorded. Under this agreement a large number of lots were purchased in and about Fourteenth place and Fifteenth place, between Morgan street and Racine avenue, upon which the market buildings were constructed. Agents to procure title were employed on August 14 and 15 but no property was bought in August. In September it was determined to put the market in the neighborhood south of Fourteenth place, between Morgan street and Racine avenue. In August and September there was no public knowledge of the plan with reference to the neighborhood. Some lots were bought in September for $7000. Some of the vendors refused to deliver the deeds, and the purchasers were obliged to pay as much as $50,000 for a 25-foot lot. Before October most of the people knew for what purpose the purchases were being made. A meeting of the entire neighborhood was held in October, at which the brokers told the people that if they could get prices reasonable they could get a company to buy up their property for a fair, reasonable price. The purchases were made by a regular contract, which provided for completing the purchase in ninety days, and that if the sale failed to go through, the purchasers were not to be held responsible further than for the loss of the cash deposit. On December 10, 1924, Mrs. Ashton, through Me-

cartney, entered into an agreement purporting to be signed by Chester R. Davis, an assistant trust officer of the Chicago Title and Trust Company, as purchaser, for the sale of the lot in question for $30,000. The signature was not his and was not authorized by him, but $2000 of the $30,000 was paid. Schiavone was absent from Chicago while these events were occurring, being engaged in his real estate business in Florida. When he learned what was happening in connection with the real estate in the neighborhood of the lot which he had sold he concluded that Mecartney had put one over on him, that the transaction was a frame-up and that Mrs. Ashton was a dummy, and he instructed Greenwald, his attorney, that if there was any way to get out of the contract he wanted to do it. Greenwald's action in the matter and the result have already been stated. Schiavone returned to Chicago, and on January 27, with Bowman Cox, one of his employees, and Greenwald, went to Mrs. Ashton's candy store and tendered her the $350 which had been paid under the contract. The substance of the testimony of Greenwald and Schiavone was that she knew nothing of the transaction, merely signed the contract as directed by Mecartney as she had signed other contracts, and expected him to pay her something for doing so, as he usually did; that she was a dummy. Cox testified that Schiavone offered to give her back the money she had paid on the property and she refused to take it, saying she did not know what the money was for; that Greenwald asked her if she bought a piece of property on Fourteenth place, and she said that she did not know whether she had or not. He asked her if she was over and looked at a piece of property, and she stated she had never been there, didn't know what this money was being returned to her for and refused to accept it. She stated that she had never seen a piece of property on Fourteenth place; that Mecartney took care of her deals for her; that she did not know what he had done and did not know whether she had bought that piece

of property or not; that she had taken title to property before and had always been reimbursed for doing so by Mecartney. Mrs. Ashton testified, in substance, that she told the men that she bought this property on the advice of Mecartney, had never seen it, never lived across from it, and that they would have to see Mecartney; that she did not tell them she was a dummy and acting for Mecartney in the matter. She knew practically nothing of the details of her business but trusted entirely to Mecartney, and she therefore referred the three men to him for her answer. Mecartney told her he was going to sell the lot for $30,000, and she made a joke of the price, not believing it could be sold for that much, both with him and with Greenwald in a conversation which she subsequently had with Greenwald in the Young Men's Christian Association building in his outer office, where she went to see a young woman employed by Greenwald about a private affair of the young woman.

The testimony of Mecartney and Mrs. Ashton is that she was the real as well as the apparent purchaser. She was a widow, fifty-nine years old. Her resources were meagre. She did not plan to move a house on the lot, but Mecartney testified that he planned to do so for her and get his commission out of the process; that the neighborhood was a good one for property that could be rented cheaply. He testified that he did not represent that Mrs. Ashton was seventy years of age and did not make any representation of her age. There is no evidence that Mecartney knew in September of the plan to use the neighborhood for the produce merchants. That purpose was not publicly known, though it was generally known that the produce merchants had to move. The neighborhood was apparently well located for the market and ought to have been available at moderate prices. Mecartney was very familiar with the neighborhood. He might have suspected or hoped or thought it probable that the neighborhood would be chosen

for the purpose, but there is no evidence that he had any intimation which was not available to the ordinary man in real estate business. When Mecartney wrote Schiavone in Florida on December 31 that Mrs. Ashton had made a loan and desired to pay her contract up in full and inclosed a deed to be signed and sent to Schiavone's office for delivery upon payment of the balance of the purchase price, he knew of the plan for the purchase of ground for the use of the produce men. Mrs. Ashton had made no loan but Mecartney had money to her credit. Because of this misrepresentation and of the guaranty contract executed by Mecartney to protect Schiavone from mechanics' liens, it is argued that Schiavone's version of his preliminary talks with Mecartney is corroborated. The guaranty agreement corroborates neither of them. It merely shows that the representation was made that Mrs. Ashton intended to move an old house on the lot. Mecartney testified that that was the intention, though Mrs. Ashton knew nothing about it. Mecartney, in stating that Mrs. Ashton had made a loan, was probably trying to bring the purchase to a conclusion without arousing Schiavone's suspicions as to the activity in real estate which had affected the value of this lot and thus to avoid a possible attempt to evade the contract and get an advanced price. The misrepresentation did not affect the validity of the contract. If the original contract was valid Mecartney needed no excuse for completing payment, for the contract provided for that. He needed to do nothing but make a tender. It did not justify the rejection of Mecartney's testimony as a witness and did not affect at all Mrs. Ashton's, who is the real party in interest, as both she and Mecartney testified. The testimony of Mecartney and Souder was at least of as much weight as that of Schiavone.

The basis for the relief asked by the complainant and granted by the decree was fraud, and the burden of proving that fact was upon the appellees. Fraud is never pre-

sumed but must be proved by clear and convincing evidence. A mere suspicion of fraud is not sufficient but if it exists it must be satisfactorily shown. (*Union Nat. Bank* v. *State Nat. Bank,* 168 Ill. 256; *McKennan* v. *Mickelberry,* 242 id. 117; *Carter* v. *Carter,* 283 id. 324.) The evidence must be clear and cogent and must leave the mind well satisfied that the allegations are true. (*Shinn* v. *Shinn,* 91 Ill. 477.) Whether the representations which Schiavone testified were made to induce the contract were material or not it is unnecessary to determine. The evidence falls short of the measure required to justify the rescission of a contract on the ground of fraud or the refusal of specific performance of it on the ground of misrepresentation or unfairness or advantage taken to procure it. There is no preponderance of the evidence in favor of the appellees, and no circumstances are shown which would justify a finding that the testimony of Schiavone and Miss Bessel is more credible or entitled to greater weight than that of Mecartney, Souder, Miss Voss and Mrs. Ashton. The appellees' counsel say that it is very evident that Mecartney was buying the property for himself and knew of the proposed establishment of the market in the district, and they refer to the dates of the contract of sale, of the contract of August 11, of the beginning and progress of operations under that contract, and of Mecartney's various acts in relation to the contract of sale. All these things, however, fall far short of proof of fraud. They do no more than raise a suspicion that Mecartney may have had reason to anticipate a rise of real estate values in the neighborhood, but they do not show any knowledge on which to base such anticipation greater than that which was accessible to the general public. The parties were dealing at arm's length. Schiavone and Mecartney were both dealers in real estate of extensive business and wide experience. While Mecartney was more familiar with the neighborhood than Schiavone, the means of

information were equally available to both, and the evidence fails to disclose any fraud on the part of Mecartney.

The decree is reversed and the cause remanded, with directions to enter a decree dismissing the bill of complaint and granting the relief prayed in the cross-bill.

*Reversed and remanded, with directions.*