George Rugen and Amanda Rugen, Appellees, v. Arthur L. Van Berschot and E. B. Harrell, Appellants.

Gen. No. 36,820.

Heard in the third division of this court for the first district at the June term, 1933. Opinion filed March 14, 1934. Rehearing denied March 30, 1934.

ROTHBART & LEWIS and PACKARD, BARNES, McCAUGHEY & SCHUMACHER, for appellants; GEORGE PACKARD, SEYMOUR M. LEWIS, RUSSELL J. McCAUGHEY and JULIUS M. ROSENFIELD, of counsel.

FRANK J. TYRRELL, for appellees; JACOB KOSBIE, of counsel.

MR. JUSTICE WILSON delivered the opinion of the court.

This was an action brought by George Rugen and Amanda Rugen, his wife, against Arthur L. Van Berschot and E. B. Harrell and others in the superior court of Cook county, on the chancery side, to restrain the enforcement of a judgment of the superior court in a proceeding which had been instituted by themselves against the defendant Harrell, and also praying in their bill of complainant for the rescission of a contract between Amanda Rugen and Perry Perkins. Perkins, one of the defendants, was never served with process and others of the defendants took no part in the trial and this appeal is prayed, allowed, and perfected by Van Berschot and Harrell.

The amended bill charged that George Rugen and Amanda Rugen were the owners of promissory notes of the value of $30,000; that on or about the 8th day of June, 1931, Van Berschot, Perkins and Harrell en-

tered into a conspiracy and conspired together for the purpose of gaining possession of the notes of the complainants. The foundation of the bill seems to be based upon the wooing of the complainant, Amanda Rugen, by the defendant Van Berschot during which he expressed his affections for her and caused her to place faith and confidence in him. The complainant, Amanda Rugen, relying upon these representations and manifestations of affection, entered into an agreement with Van Berschot under which the complainants agreed to purchase approximately 71 acres of land in the Rio Grande Valley, Texas, and in consideration therefore to exchange a residence located in Des Plaines, Illinois, together with $27,000 of the notes in question and $3,000 in mortgage notes.

It is not clear from the bill just what the fraud practiced upon George Rugen was, but it is evident that he is seeking to avail himself of the promises of Van Berschot to marry his, Rugen's, wife.

The bill also charges that at the time Amanda Rugen signed the contract she did not have her glasses with her and therefore could not read the agreement.

Before discussing the evidence it might be well to consider the original proceeding which was started in the superior court by the complainants as a suit in replevin against Harrell, the holder of the notes. There is no direct evidence that Harrell participated in any conspiracy. The complainant had no talks or dealings with him and, so far as is disclosed, his only connection with the defendants appears to have been that he had driven the car of Perkins when he, Perkins, took the parties out to view land situated in the Rio Grande Valley.

Harrell testified that he had lived at Mercedes, Texas, for 9 or 10 years and was in the container business and prior to that in the produce business; that he was the owner of the notes totaling about $14,500 which

he had obtained from Perkins, and that as a consideration he gave to Perkins $5,000 of Mercedes Development Company stock and $4,700 worth of Hidalgo County Road and Bridge Warrants. There is no testimony as to the value of the stock and warrants other than that of Harrell, who testified they were worth their face value. He also testified that he had been in business in Texas and owned land on which he employed others to do the work. He sent the notes for collection through the Hidalgo County Bank & Trust Co. to the Continental Bank of Chicago as they became due, but they were not paid. Subsequently, Van Berschot, who was in Chicago, wired stating that he had a sale for the notes and that if he, Harrell, would bring them to Chicago he would be able to sell them. Thereupon, he came to Chicago and was introduced to a Mr. Schmidt who told him there would be a delay of a few days and he was taken by a Mr. Branower to an office in Chicago where he was introduced to a man who told him he was the secretary to the man who was to purchase the notes and stated that he wished to check them over; that thereupon, he, Harrell, laid his notes on the desk and they checked them over and asked him in what form he wanted the money, and just then the man who said he represented the one who was to purchase the notes told him he was from the State's attorney's office and had a writ of replevin and several deputy sheriffs appeared on the scene and read this writ to him; that he accompanied the deputy sheriff to the office of the sheriff, but they would not give him a receipt for the notes. This transaction took place in the office of Branower, who appears to have been an indorser on the back of the notes held by Harrell. The defendant, Harrell, was served as John Doe, and it appears that one Jacob Kosbie, one of the solicitors for complainants here, and the attorney in the replevin

suit for the plaintiffs, either served the writ or was present at the time.

The entire transaction shows on its face that no person intended to purchase the notes and that Harrell was induced to come into the jurisdiction of the courts of Cook county by a subterfuge and was met by a summons made out to John Doe, defendant, as a result of which he found himself a party to the replevin suit brought by the Rugens.

While the value of the notes was over $10,000, the bond to the sheriff was for only $5,000, although the statute required a bond in twice the amount of the value of the property replevined. This all took place about August 1, 1931, although the sheriff did not return the replevin writ with his indorsement thereon together with a statement of the bond until April, 1932, and then only in answer to a petition filed by Harrell in the replevin suit. On motion of Harrell in the superior court in the replevin suit an order was entered requiring the plaintiffs to furnish a proper bond of $40,000. This plaintiffs failed to do and an order was entered in that court dismissing the replevin action and an order of *retorno habendo* entered of record. No appeal was perfected from this order although prayed and as it stood it was complete with a judgment for costs against the plaintiffs. This final order was entered May 17, 1932, but in the meantime on May 4 of that year, this bill of complaint was filed in the superior court and a temporary injunction secured from Judge Lindsay without notice. At the time of obtaining the temporary injunction a bond of only $500 was required and furnished. On motion of the defendant Harrell this injunction was dissolved on May 16, 1932, by Judge Lindsay. Subsequently and long after the judgment *retorno habendo,* Judge Gentzel, sitting in chancery, granted another injunction on an amended bill of complaint on the filing of a

$5,000 bond which, in effect, restrained the sheriff of Cook county from turning over the notes under the order of Judge Steffen. Thereupon Van Berschot asked for and obtained the appointment of a receiver to hold the notes.

We are at the outset of this case confronted with the unique position of finding a complainant who had elected to bring an action at law in replevin, after being defeated in that action, asking by a bill in chancery in a court of concurrent jurisdiction that the execution of the judgment be restrained. We are familiar with the rule that where a party who has been made defendant in a proceeding at law comes into chancery and sets up facts showing that he has a good defense to the action which is not cognizable at law, that a court of equity will take jurisdiction of the matter. But, in this case, the defendant does not come into a court of chancery, but instead we find a plaintiff seeking to avail himself of this right where he, himself, had previously invoked the jurisdiction of a law court and had met with defeat. Even though a defendant has had a judgment rendered against him, a court of equity will take jurisdiction but only in conformity with the statute requiring a bond in twice the amount of the judgment. In the case at bar the bond required of the plaintiffs was far less than the value of the goods replevied. We find then that we are confronted with a situation where a court at law had rendered a judgment against the complainants in a suit brought about on their own motion and where the defendant in that proceeding had been brought into the jurisdiction of the court by a subterfuge. Thereupon another court had granted an injunction in a chancery proceeding and dissolved it upon a motion of defendants when apprised of the situation. After this a third court again grants an injunction and requires a bond of complainants at much less than the value of the notes. It

does not appear as if the complainants were in a court of chancery as a result of their action with a record without blemish. We further find one of the complainants, Amanda Rugen, openly charging in her bill of complaint that she had agreed with one of the conspirators to desert her husband and family, violate her marriage vows and elope with the conspirator Van Berschot. We also find the husband seeking to avail himself of the fact that his wife had consented to desert him in order to avail himself of that fact in an action to set aside a contract which he had not entered into. He makes no claim that any fraud was practiced on himself, but claims a joint ownership in the notes.

George Rugen testified that he first met Van Berschot about May 10, 1931, at Rugen's home in Des Plaines. Van Berschot told him he would like to have him go to Texas to inspect some land. Rugen stated that he had already been in Texas in February and liked the country and would take the trip. He and his wife and his son and his son's wife paid $25 for the trip and left Chicago for Texas on May 12th. Accompanying them on this trip were also Carlson, Van Berschot, Gunnell and Mrs. Rugen's brother and his wife. They were taken out to see some property and inspected some of the groves which were for sale. They were then taken up to the clubhouse and subsequently taken over to Mexico on a pleasure trip. They examined some property which Rugen said he was willing to pay for at the rate of $1,000 an acre for 10 acres if Mrs. Rugen was willing to be a party. Rugen stated that there was a difference in the value of uncultivated land and land with two-year-old trees on it to the extent of $200 or $400 per acre. On this trip a contract was signed by the Rugens for 10 acres at $10,000 with an option for an additional 10 acres, upon written notice by the purchasers, the Rugens. The Rugens then returned to Chicago and on or about

June 6th, Mr. and Mrs. Rugen again left for Texas with Van Berschot. Part of the understanding of this second trip was that Rugen was to get a prospect and take him with them on the trip in order that Van Berschot would be able to sell some property to the new prospect. Rugen testified that he got a Mr. and Mrs. Fred Kropp to go on the trip with them for that purpose; that Gunnell took Kropp out and showed him the 10 acres which he, Rugen, had contracted for, but that Kropp was not much impressed and went home the same night; that the Rugens remained in Texas two or three days and then drove to Matamoros where they had dinner and a man came up to the table and Van Berschot introduced him as Perry Perkins; that they then all rode to a resort where they had roulette wheels and the next day he, Rugen, was taken around and introduced to various individuals owning property who told him of the receipts they derived from the cultivation of these lands and showed him statements from the bank. Rugen's testimony is interspersed with a description of the manner in which they were conveyed around in automobiles and statements of Gunnell to him that Van Berschot was trying to "vamp" Mrs. Rugen. The party returned to Chicago, arriving here about June 13th. While he, Rugen, was in the bedroom at his home in Des Plaines, he saw a piece of paper sticking out of a book and found that it was a contract between his wife and Perkins for a 71-acre tract for a consideration of $41,000 and which recited that the trust notes executed by the Chicago Title & Trust Company had been turned over as part payment. He then located Stewart Van Berschot at a restaurant and took a receipt for the $30,000 worth of interest notes and was informed by him that they were at the Continental Bank; that the next day he, Rugen, saw a lawyer. Rugen testified further that he had never signed any deed transferring the Henry avenue

home. This was the house located in Des Plaines. Neither did Mrs. Rugen acknowledge the deed.

On cross-examination Rugen stated that he had heard a good deal about the price of land in the Rio Grande Valley at the time he was there on his second trip; that he agreed to give them $1,000 an acre for the property for the 10-acre tract which he agreed to purchase, provided they would take the property on Henry avenue for the sum of $6,900. Sometime after he returned from Texas, after the last trip and after he had seen the contract between his wife and Perkins, Rugen and his wife, together with Carlson and Gunnell, defendants herein, took a two weeks' automobile trip in the east.

Amanda Rugen testified that she and her husband had owned a farm near Glenview and sold it for $65,000 and received $25,000 in cash and took a $40,000 mortgage, of which $10,000 had been paid; that the $30,000 worth of notes remaining belong to herself and husband and these notes were the subject of this suit; that she first met Van Berschot in May, 1931, but that her husband and brother knew Gunnell before that time; that Van Berschot kept coming to see her after that for several weeks and begged her to trust him and in the early part of June he wanted to take her to Hot Springs to get a divorce and that he stated that she deserved a better man than her husband and that he would take good care of her and marry her and that she believed him; that she was not on good terms with her husband and did not care for him; that she and her husband took the trip to Texas and drove around to various places in a Cadillac car, which Van Berschot stated that he owned; that she was introduced to Perkins by Van Berschot and that Van Berschot asked to have her notes so that he could show them to Perkins; that she went to her room and got the notes; that Van Berschot came back about dark to the club-

house and took her into his office which he had at the club and had some papers in his hand and stated that he had obtained the option from Perkins at his own price but needed her signature; that Van Berschot said he intended to marry her and he then covered the papers so that she could not see the writing and told her to sign her name; that she told him she would have to go in and get her glasses to read the papers, but that he said for her not to doubt him and that she then signed. She testified further that Van Berschot stated that he would sell the property for $1,500 (probably per acre) and that she would have her profit by spring; that they then sat down for supper with Mr. Knapp, his son and wife, Perkins and Mr. Rugen; that after supper Mr. Van Berschot told her to pack immediately as they were all leaving for Chicago.

On cross-examination Amanda Rugen testified that she had not worn glasses on any of the occasions that she was in the courtroom, but after examining the trust deed she was able to identify it as the one she signed. She further testified that she had agreed to purchase 10 acres on her first trip to Texas and had signed a written notice to the effect that she did not desire the additional 10 acres. She also testified that she received the deed for the 10 acres from Van Berschot several weeks after she returned from the first trip to Texas and she executed a deed to the house on Henry avenue for the 10 acres together with Mr. Rugen and gave it to Van Berschot. It was on the second trip and after this first purchase that she signed the contract in question and gave the notes as part of the purchase price for the 71 acres. She also stated that her husband was to get a commission from any deals with prospects he might procure who purchased land, on this second trip; that they induced the Kropps to go along for that purpose.

Robert Rugen, the son, who was married and 24 years of age, testified that he tapped the wires con-

nected with his mother's telephone at the Des Plaines house and heard the conversations between Arthur Van Berschot and his mother, in which Van Berschot wanted to know what was wrong and how Mr. Rugen found out what was going on around the place. This was after the last trip to Texas.

Neither of the Rugens connected Harrell with the transaction in any way, nor did they refer to him at any time in their testimony. It does appear from their testimony, however, that they were driven around the country by Van Berschot in a Cadillac car which he claimed was his and were also driven around by Knapp and Crenshaw. According to their testimony they first met Perkins at the clubhouse at the time the contract between Perkins and Amanda Rugen was entered into. From this testimony it is apparent that the Rugens did not see Perkins until the day before the contract was signed and there is no evidence that they at any time saw, talked with, or drove around with, Harrell, the defendant in this proceeding.

A witness by the name of Leola Hager, who appears to have been in Texas at various times and engaged in the land selling business, testified that she had seen Harrell and Perkins together in the lower Rio Grande Valley and that he, Harrell, continuously drove Perkins' car.

A witness by the name of Sam Kosbie, a brother of the attorney for the complainants, in rebuttal testified that he was in Mercedes in March of 1930, and that he rode in a car driven by Harrell and had a few conversations with him in which he told him, Kosbie, that he had a farm there and that he was hired by Perkins to drive these people around. This appears to have been the only time Kosbie was in Texas. He did not remember the kind of car it was, and Harrell denies ever having heard of this man Kosbie.

Harrell's testimony has been referred to already. He stated that he had known Perkins for a number of

years, but had never been associated with him in any real estate transactions nor had he been associated with Van Berschot; that he did not know from whom Perkins obtained the notes and knew nothing about the contract between Perkins and Amanda Rugen; that he had not acted as a chauffeur or a handy man in driving cars, but had on one or two occasions driven Mr. Perkins' car when he, Perkins, was in it and that Perkins had on one or two occasions driven his, Harrell's, car; that he banked at the First National Bank and the Hidalgo County Bank and Trust Company and had approximately $2,000 or $3,000 on deposit at the time he purchased the notes; that he was not in Mercedes during the month of June, 1931; that he never drove any tourist parties for Perkins; that when he purchased the notes he was told they were secured by property in or near Chicago, Illinois, and that he did not know how much Perkins had received by reason of his contract with Amanda Rugen; that he supposed that Perkins was the lawful owner of the notes; that Perkins told him he had received a wire from Van Berschot telling him if he would take his, Harrell's, notes to Chicago he would be paid for them. He stated further that he thought the investment was good and at the time he made it, including the notes in question, his worldly worth was approximately $35,000.

Complainants insist that Harrell on cross-examination stated that he did not care a lot about the $14,500. An examination of the record, however, shows that he was interrogated as follows:

"Q. You did not care an awful lot about this $14,500, did you?

"A. Yes sir."

The answer to this interrogatory might be interpreted either way. It may as well have meant that he did care about the $14,500.

The basis of complainants' bill is that the contract was procured by reason of the fraud perpetrated by

Perkins, Van Berschot, Kissell, Nueberger, Branower and Hirschritt. There is no evidence that Kissell, Neuberger, Branower or Hirschritt obtained anything by reason of the transaction. The only evidence as to Perkins appears to be that he was the party who entered into the agreement and he does not appear to have said or done anything which contributed to the procurement of the agreement. The entire transaction appears to have been brought about and manipulated by Van Berschot and he is charged with having promised to marry the complainant, Amanda Rugen, and thus obtained her confidence. He also held out to her an inducement that in the spring she would be able to sell the property and make a profit. She was a married woman at the time and with her on the trip were her husband, her son and his wife and her brother and his wife. She stated that relying upon Van Berschot's promise to marry her she signed the papers without reading them. It does not appear from the evidence, however, that she was unaware of what the contents of the contract consisted. She apparently understood that she was purchasing 71 acres of land in Texas owned by Perkins and was to pay a certain price and to give her notes, secured by the Chicago mortgage as part of the purchase price, which she did.

A party who signs an instrument relying upon representations as to its contents when he has an opportunity to ascertain the truth by reading and does not avail himself of the opportunity, cannot be heard to say that he was deceived by misrepresentations. *Dickinson v. Dickinson,* 305 Ill. 521.

The transaction in question took place on or about July 1, 1931. A bill to rescind a contract on the ground of fraud should be started as soon as the fraud is discovered. *Day v. Fort Scott Investment & Improvement Co.,* 153 Ill. 293. The bill in this case was filed in May, 1932, nearly a year after the transaction and at least 10 months after the alleged fraud was discovered.

In a bill to set aside a deed procured by fraud, the burden is upon the complainant and the proof must be clear and convincing. *Kuska v. Vankat,* 341 Ill. 358; *Schiavone v. Ashton,* 332 Ill. 484.

Perkins is not a party to this proceeding and, consequently, the contract cannot be set aside or voided. The decree of the superior court recognizes this fact and makes no such order. Neither is there any finding in the decree to the effect that Kissell, Neuberger, Branower and Hirschritt were parties to the fraud, nor is there any order entered as to them. While the decree finds that the contract between Rugen and Perkins was secured by fraud and deceit and as a result of the conspiracy charged in the amended bill, this is not binding and unavailing because of the fact that Perkins is not a party to the suit and therefore cannot be bound by the decree even though he knew of the pendency of the cause.

There is no testimony in the record to the effect that Van Berschot had any interest in the notes and the decree does not so find. There is no evidence in the record that Harrell participated in the alleged fraud and his only connection with the case appears to be that he was seen driving Perkins' car on different occasions. There is no testimony that he drove Perkins' car during any of the times while the Rugens were in Texas nor in connection with other visits to the various properties which they inspected. There is no testimony that he purchased the notes with knowledge of any fraud or want of consideration, and the only testimony in the record as to payment for the notes by Harrell is that of himself as already set out in this opinion. No matter what suspicions may arise by reason of the transaction, it cannot be said that such surmises or suspicions can attach to the defendant Harrell, even though he may have been acquainted with Perkins. They both lived in Mercedes, Texas, and

there is nothing strange in their acquaintanceship. The transaction took place in Texas. The holder of negotiable paper indorsed in blank is presumed to be an innocent holder in due course. *Mann v. Merchants' Loan & Trust Co.*, 100 Ill. App. 224; *Morey v. Simpson,* 197 Ill. App. 55.

The property itself may have been of a considerably less value than the price paid, although Rugen testified that property with growing trees was worth from $200 to $400 per acre more than the uncultivated land. The record is silent as to whether or not the property in question was improved with fruit trees or crops. The Rugens had already paid $1,000 an acre for property which they had examined and concerning which they made no complaint. This price, while high, may not have been unusual in the Rio Grande Valley if irrigated and containing bearing fruit trees. In our opinion the record does not contain evidence sufficient to charge Harrell with the purchase of the notes in question with knowledge of a fraud perpetrated in their procurement.

The decree orders the receiver to turn over and deliver to the complainants the notes claimed by Harrell and that the injunction issued be made permanent. This is the only relief provided for in the decree and according to the testimony the only person affected thereby is the defendant Harrell and for that reason and the other reasons advanced in this opinion, the decree of the superior court is reversed and the cause remanded with directions to proceed in conformity with the views expressed in this opinion.

*Judgment reversed and cause remanded with directions.*

HALL, P. J., and HEBEL, J., concur.